All right, we'd be happy to hear Mr. Toothman. Good morning. My name is John Toothman. If it pleases the Court, I'm here on behalf of Appellant's Devil's Advocate, LLC, and myself as a pro se plaintiff below and appellant here. I'm an attorney. What I do for a living is what this case is about, at least in part. I still try cases, but I've been an attorney for many years, and I have a certain expertise. And for over 20 years, I have been able to be offered as an expert on issues like legal fees, ethics relating to legal fees, and sometimes malpractice, things like that, things about the legal profession. And in this situation, in this particular day, or in this particular event, we were contacted to provide expert testimony, at least to propose to do that, on behalf of the appellee here, Zurich American Insurance Company, for whom we worked before, not the same team. This was back in 2010. And their problem was that Zurich was being sued by people who claimed to be covered by Zurich policies, and their damages they wanted Zurich to pay were legal fees. And I was contacted partly because I think I have a good reputation for this. In the expert business, reputation is everything. Your resume is a shorthand version of displaying your value. Now, what happened here eventually, I know you've read the briefs, so I won't repeat everything, was that essentially Zurich got to pass off my resume and my thoughts in a proposal we made to them as though we had been retained by them and had come on board and was working for Zurich. That wasn't true. They maintained to us they still hadn't decided. They wanted to haggle a bit about the fee. And they stalled and stalled while we were holding dates and weeks open for testimony and preparation and so forth. And then we found out what happened on January 13, 2011. We came to find out that they had, several months previously, designated me as their expert to testify in their case. And they included my resume and they included things I had said in my proposal to them and passed them off as a designation of an expert, topics of testimony, opinions, that sort of thing. This set off a number of problems because it turned out that what they also didn't let us know was that their opponents in the Houston State Court action where we were designated as their experts had moved to disqualify us, not because I was unqualified. In fact, this was a lucky day for them. They found the technicality they could use to try and undermine my ability to testify because Zurich, unbeknownst to us, already had another expert in our topic area, had already designated that gentleman. And when they designated me, they put us both on the same statement. They listed two experts and underneath it one set of things that we would each supposedly testify to. It was news to us. And literally things hit the fan at that point because on January 13, 2011, when we found out, we found out that my livelihood, my reputation, my resume were in play without our knowledge and that a very capable Texas firm had moved to disqualify us. Disqualification can be the death knell of any expert witness' ability to make a living. Every time you're deposed, every time you're cross-examined, every time interrogatories are asked, one of the subjects that come up is, have you ever been disqualified? Have you ever failed to qualify? And your value goes way down. I've testified over 70 times in many courts around the country. We even do work internationally from time to time. Never been disqualified. I'm at the stage in my career as an expert where even people who think that I shouldn't be qualified will stipulate to it because they don't want to hear my resume delivered by someone who knows how to speak in court and use exhibits well. In the Zurich situation, we have... Bottom line in this case, where's the meaning of the Meyers to form a contract? We issue to them a form contract that we use and a proposal that references it and describes how much we're going to charge them, which fills in the blanks in the contract. That went to them, I think it was, early November of 2010. On November 19th of 2010, what they did was they designated us and included my resume. We maintain that that's the act of acceptance. That's the manifestation that they are agreeing to our terms because they otherwise cannot designate me or use my name under our contract, which they had in hand. One of the things that triggers liability to us for at least part of our fee, either half or whole, depending on what they did, but we have a clause that says if you use our name, if you publish the fact that you've retained us, we earn at least half our fee because that's part of the value of a good expert or even a bad expert, I suppose, of an expert who's effective, let's call it that, someone who's recognized and hopefully brings fear to the other side. And if you have that kind of reputation and experience, it has value. And unfortunately, this case is a very excellent demonstration of what happens with the downside of that kind of reputation is. Zurich tried to take the reputation embodied in the name, the resume, the proposal, pass it off as being bought and paid for because they assumed it would move the other side to cave in. This was not a unique case for us, but you'll find it probably an unusual case. The attorneys on the other side that they were working against, we had worked against before as an expert. They knew us. We had even reviewed their bills from that very firm. They knew us. I was scheduled to speak on an ABA panel on legal fees at a big meeting with one of their partners. We were both experts on legal fees. When they heard my name and then I was testifying against them, I'd like to think it upset them enough. It upset them enough to seize the opportunity to move around Christmas of that year to disqualify us on the 3rd of January right after the 1st because they were just hoping against hope they'd be able to get rid of me on this technicality. But there's more. In that case, when we were contacted by Zurich, I mentioned we had worked for Zurich before in Virginia, a case involving LeRae Cavers. We've worked for many insurance companies. We've worked for Congress twice. We've worked for many federal agencies, state agencies, local agencies. We've worked for not just big and small insurance companies. We've worked for big and small corporations. We are working now for the Republic of Guinea in Africa. We've worked for baseball teams, two of them. We've worked for many, many different corporations and law firms. People think that because we sometimes testify against law firms that we must be anti-lawyer. No, we always say we testify either way. We just testify in favor of the reasonable fee. I've written the book, The Treatise on Legal Fees, that organizes the subject better than it had been before. I've written another series of books. My publishers are well-known publishers. Some of my books are in their second edition. We do a lot of pro bono work. We do a lot of work for the press. We've been retained by American Lawyer and The Washington Post in the past as experts for them. We also are called many, many times on these kind of questions because we help sort it out. And that's what Zurich was trying to take from us without our knowledge or permission. When was the contract reached? It was reached when they took the act of indicating they're taking our value. Even unbeknownst to us, they took it, they ran with it, they tried to get away with it, and they got caught. And then they attacked me and us saying that we were doing something. Where is all this leading? Because it seemed to me that you have all these different claims. Yes, Your Honor. But at heart, it seems to be nothing but a breach of contract case. And Judge Ellis makes the point that you can't have a contract without a mutual meeting of the mind and without conditions preceding being satisfied. And they weren't here. I mean, I don't understand how all these other claims, intellectual property claims, quasi-contract claims, I don't understand how they all get into it. It just seems to me a simple breach of contract case, which is overcomplicated, and it's through the claims against the wall in the hope that something would stick. Well, Your Honor, when you plead in the alternative, we know we didn't have a signed contract from them, so that's what quasi-contractual claims like unjust enrichment are for. They converted our name. What I'm saying is in this kind of situation where you would, you know, there were back and forth discussions and negotiations, wouldn't you expect, you say you didn't have a signed contract here, but given the back and forth negotiations over fees and the rest, wouldn't you expect that those negotiations would ultimately conclude in a contract? Well, I would say, first of all, we believe they concluded in a contract, but not by the normal path. The parties were clearly understood that they were aiming and headed toward a contract. And the problem is they couldn't agree on some key terms, so the contract didn't. That's not really what happened. They told us that they had to hear back from the home office and it was just taking time. We found out later that in the meantime they had gone ahead and designated us and got us on the bad side of a motion to disqualify us without our knowledge and permission. We weren't going back and forth. They were stalling and stalling and stalling, hoping that using our name would trigger a settlement. I thought there was a motion to amend pending to add you as an expert and that you were aware that until the Texas court agreed to allow them to do that, what was before them was an RFP from you. No. First of all, they still designated us. That closed the deal. That was all false. Our expert is a Texas expert on civil procedure law and an opposing lawyer even testified. Weren't they two years beyond when they could identify experts in that case? Your Honor, in the Texas state court, that's not unusual. The case was held over and each year it would get clicked by another year. And that's why they thought it would be routine to have us designated because so much time had passed and there wasn't any prejudice. There would be plenty of time to prepare for the trial. We would have been fine with that if that were the fact. The fact is they were moving aggressively to use us as though we were hired. When the motion was made to disqualify us. How did they use you? You never testified. They designated me, Your Honor. That's the value. They said this guy with this resume, the name that you know and you've encountered before, is on our side. We are paying for him and he's good. But did you testify? I didn't testify, but I gave them information and they used it in the designation. I disclosed it to the other side. Well, that would be normally what a party would do, but in this case I didn't think that any kind of contractual agreement really would arise that the thing you were chiefly going to be paid for was your testimony and that the contractual agreement, there was a condition to proceed to any contract that you'd be approved by the district court. See, none of that was true. What was true is that they had the opportunity to use our resume. They used it. In our contract it says that you do that. I mean, that's what parties do. But they can only do that if they pay. The contract says that. You've got some rebuttal time. I do, Your Honor. Unless my colleagues have any questions. Thank you, Your Honor. We have none. Ms. Lippincott. Thank you, Your Honor. May it please the Court. Kelly Lippincott on behalf of Zurich American Insurance Company. As Mr. Toothman noted, this case originated from a litigation that was pending down in Texas. It was an insurance coverage action against my client, Zurich. During the course of that litigation, counsel for Zurich in the Texas action decided they needed to have a different expert or an additional expert and reached out to Mr. Toothman to serve in that capacity. The problem was, as Judge Keeley noted, that was two years after the time to designate expert witnesses had passed in the Texas litigation. Therefore, in order to get permission from the court to have Mr. Toothman serve as an expert,  the counsel for Zurich in the Texas matter filed an amended designation noting Mr. Toothman's name and the expected areas of testimony and also subsequently filed a motion to amend to seek a, I believe it was for a preliminary hearing or pretrial hearing under their Rule 166. This initial contact with Mr. Toothman occurred on October 12th of 2010. The filing of the amended designation was in November and then shortly thereafter in December the amended motion pursuant to Rule 166 was filed. The court never heard that motion. As you, Your Honor, see from the record, there was a series of continuances that took place. One is a result of the judge, the trial judge, expecting the birth of a child and so the hearing date was pushed off until the following year. That was never heard and before there was a hearing on whether or not Mr. Toothman could be late designated, two years after the time to designate such experts, there was, as we can, I would describe, a breakdown in communication between Zurich. Because of the fact that this was a much belated motion, you wanted any kind of financial arrangement with the appellant to be conditioned upon court approval. Correct, Your Honor. There was a good chance it wouldn't be forthcoming. And not just that, we also didn't want him to waste the time and the effort in reviewing the legal bills that were at issue in the Texas litigation until we had that approval from the Texas court. And as you see throughout the email exchanges in October and November with Mr. Toothman, there was a continued update to him as to what the status was of the motions and the motions hearing and that holding off and waiting to get, also they were waiting for some additional information from the opposing counsel. If asking for expert designation and filing a motion to have someone designated as an expert, if a party does that, which they do all the time, and if that's going to give rise to intellectual property claims and quasi-contract claims and unjust enrichment claims, the mere act of filing an expert designation or request for an expert designation is going to give rise to all of these different claims, then we have further transformed litigation and we've piled litigation upon litigation. Not only do we have the litigation over attorney's fees, but we have a separate litigation over the expert designation. That just is no longer a motion which is approved or denied. It spawns all of these different business tort claims and unjust enrichment claims and intellectual property claims and all the rest. It's litigation piled upon litigation piled upon litigation and you wonder, where does this chain ever end? I agree, Your Honor, and it makes it impossible to ever seek permission to have a late designation of an expert. If you're going to incur this kind of liability simply by seeking designation as an expert, that's a pretty radical step. I agree, Your Honor. Talk about this disqualification. What does he mean by that? The disqualification that he is referring to is subsequent to the filing of the amended expert witness designation identifying Mr. Toothman and his expected areas of testimony and the filing of the motion for a pretrial conference pursuant to Texas Rule 166. Opposing counsel in the Texas litigation sought to disqualify Mr. Toothman. As he described, it was a technical disqualification because Zurich already had an expert to testify as to legal fees. I'm not clear on exactly all the reasons for underlying counsel to want to have an additional or different expert, but in the course of that litigation determined that it wasn't sufficient to use the expert that they had and that they needed to seek out an additional or different expert, and that role was identified for Mr. Toothman. It's very problematic at this belated date whether the court's going to approve any kind of expert designation at all, even from someone who's highly qualified. And, you know, so having that fact stare you in the face would say, wait a minute, before we enter into any kind of an arrangement, we want to make sure that the court's going to approve this business. As you pointed out, it's real late in the game. And also, you don't want the appellant going to all this work if he's never going to testify. I mean, just as a matter of sequencing, the approval ought to precede the effort. And, Your Honor, I think any chance that counsel would have of late designating an expert would be nothing, absolutely nothing if they couldn't at least identify to the court who they intend to use as this late designated expert, to seek permission or leave to designate an expert without identifying who that expert is or what areas of testimony they are expected to testify regarding. I can't imagine any court giving permission, blanket permission, to designate an expert, any expert you want on anything you want, two years after the time to designate experts has passed. In one of his orders, Judge Ellis found or stated that Mr. Toothman and his company, calling them the plaintiffs, were aware of the designation of Mr. Toothman as an expert in the Texas litigation. And then he goes on to say the record makes clear that the parties never reached an agreement for the defendant to retain plaintiffs. So was the awareness of Mr. Toothman based on prior discussions with Mr. Dancy or how did that happen? It certainly may be based on that, but I think one of the things that the court looked at in particular, which is at the joint appendix at page 420, is a December 8, 2010, email from Mr. Toothman. And this is in regards to that panel, that expert witness panel that he said that he was a part of with members from the opposing firm in the Texas litigation. And it said, Naming me as a witness before we were retained is likely to cause us some issues with Gardair and Voorhees. Gardair and Voorhees is opposing counsel in the underlying Texas litigation. So certainly he was aware of this designation at that point and was aware that he had been identified to the other side in the Texas litigation as potentially serving as an expert. And I think that was one of the things that Judge Ellis focused on and to support his view, that this was something that Mr. Toothman was, in fact, aware of. All right. Thank you. I know that there's – Do you have something further? I don't have anything further. If there's any other particular issues or claims that the court would like me to address, I'd be happy to do so in my remaining time. Are you okay? Okay. Thank you, Your Honor. The other claims we raised include trademark because we trademarked her name. There is a mistake by the lower court on that claim because the Fourth Circuit's own decisions that it relied upon mistakenly assumed Virginia would use the two-year statute of limitations for a fraud claim with a federal trademark claim when, in fact, the Lavery case that we cited shows that the Virginia Supreme Court has said, to the contrary, trademarks are property and it's a five-year statute. The copyright claim was to protect my resume and our proposal, which were copyrighted, and they were protected because of their value. The lower court found, as a matter of law, that there was fair use, although there was a prima facie demonstration of copyright breach. There was also, in the court's eyes, a problem of fair use or an affirmative defense for Zurich of fair use. This court has apparently joined one group of circuits, the Second and Ninth, I know are also part of the same group, applying a system called transformation to determine whether use is fair by how much of a particular copyrighted material is used and for what purposes at all. I believe Your Honor was involved in that case on the panel that ruled that the Fourth Circuit would follow that transformation theory and apply it to find fair use. That was not done below. There was no finding of transformation. Transformation would have been impossible in these facts because the resume was copyrighted and was simply Xeroxed. There was no transformation attempted at all. Well, if you testify as many times as you say, a good opponent of the people you're going to testify to is going to find your resume on the Internet. Well, it's going to be given to them if I'm hired. Yeah, but I mean, it's easy to find your resume without you giving it to them. It changes all the time. Every year there are things that change, so it's not always the same. It's pretty well known. But the point is that the resume embodies the fact that I've been retained and that I have opinions that they display to the other side, which was not true. They just wanted to use the name in the resume. And when the email that Ms. Lippincott read was actually involved, it had to do with causing problems because our name was used. There was no disclosure until January 13th that my resume had been used or that we had supposedly been designated and retained. All they told me that day was that they had told the other side my name. And they got a bill from us because under our contract, not only does that close the deal, close the loop, close the circuit on the contract, but by using our name under the contract, they have to pay for the right to do that. Otherwise, it's just open season on experts. Experts make their living by being able to control what engagements they'll take and which ones they won't because they don't want to lose. They don't want to be on the wrong side. And that's why there's value to saying, I have found this expert to work with us because they can research us. They can see what we've worked on before. They may be able to find our resume, at least as it existed then. But if you find it someplace else, you don't know that I'm on your case and that I'm working on that case. And, in fact, we were supposed to be saving time to testify within a matter of a few weeks after we found out what had happened and that they never had planned to hire us because they had never wanted to do anything more than use our name and drop our name on our resume to try and get the other side to settle. I thought that there was an incident involving you and Mr. Dancy with a telephone call after you called him and said it's time to pay based on the filing of our name with the court and that you hung up on him. No, we didn't. They called us with two people on the line and we only had one. And they wanted to have this whole thing. Whenever they say they had a telephone conversation with us, it never happened. Why? Because telephone calls are deniable. That's why we have a problem with getting a 12 v. 6 dismissal or a 56 summary judgment granted in this situation because these facts were easy for them to try and hide. They tried to make it. I had told them before that we will not have any unwitnessed phone calls anymore because they were trying to call us and blurt something over the phone and then have two people swear against one. So we declined to take their phone calls. We let them communicate with us by email and letter all they wanted, and that's how we communicated with them in writing. Because when you're dealing with somebody who will misrepresent things under oath to the court, Mr. Dancy did in two affidavits he filed as we produced in our exhibits, how can you win that dispute? You need to be able to step back and say we're protecting ourselves by not having any unstructured communication. It seems like to me you're opening the door to say any time that a court moves to or that a party moves the court to designate an expert, it must be doing so in bad faith if the expert never testifies. Of course, it's just using the expert's name. But, you know, in addition to being highly litigious, it seems to overlook the facts here that this was a two-year delay after the court said no, the time for designating experts has passed and would make perfect sense for you not to do a whole lot of work until you were certain that the court was going to overlook that substantial delay. And if this is bad faith and misappropriation and unfair use and everything else you claim, then it's hard for me to sit to see how somebody can make a motion to have an expert approved. But this is not going to... I'm not sure that your position is going to bode well for experts in the long run because they'll shy away from them like the plague with this sort of liability. You might want to be careful what you wish for. I'm sorry, my time is up. You can make another statement if you want. Well, Your Honor, they did file a motion without any expert's name on it. It was pending. My expert testified in this case that they didn't have to name an expert in order to ask for more time or to designate somebody, and they'd already done that. But the difference between my situation and yours is they needed to say what they were doing and be honest about it, not go behind my back and designate me with words that had nothing to do with what I might testify about and use my resume like I'd been hired and consented to it when I knew nothing about it. All right, thank you. Thank you, Your Honor. I appreciate your time. We'll come down in Greek Council and move into our final case.
judges: J. Harvie Wilkinson III, Henry F. Floyd, Irene M. Keeley